**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FEDERAL TRADE COMMISSION,   )
              )
       Plaintiff,  )
              )
              )  Civil Action No. 16-1669
    v.        )  Judge Nora Barry Fischer
INNOVATIVE DESIGNS, INC.,    )
              )
       Defendant.  )

## MEMORANDUM OPINION

### I.  INTRODUCTION

Presently before the Court is the Motion to Determine Privilege filed by Innovative Designs, Inc. ("Defendant"), seeking the return or destruction of several purportedly privileged email chains inadvertently disclosed to the Federal Trade Commission ("FTC") in response to its requests for production. (Docket Nos. 24, 26). In its Response, the FTC argues that the emails in question are not protected communications under any legal theory, and were properly disclosed. (Docket No. 33). Defendant counters that the emails are covered by attorney-client privilege, the work product doctrine, and Federal Rule of Civil Procedure 26(b)(4)(D). After careful consideration of the parties' positions, and for the reasons that follow, Defendant's Motion is GRANTED, in part, and DENIED, in part.

### II.  FACTUAL AND PROCEDURAL BACKGROUND

Defendant is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. (Docket Nos. 1 ¶ 7; 7 ¶ 7). Around November 2011, Defendant began to market Insultex House Wrap ("Insultex") for use as a weather-resistant barrier on exterior walls.

(Docket Nos. 1 ¶ 9; 7 ¶ 9).  Defendant claimed that Insultex had the added benefit of providing thermal insulation.  (Docket Nos. 1 ¶ 11; 7 ¶ 11).  Insultex was initially advertised as having an "R-3" insulative value; in 2015 a thicker version was marketed as having an "R-6" insulative value.  (Docket Nos. 1 ¶¶ 13, 15 − 16; 7 ¶ 13, 15 − 16).  According to 16 C.F.R. § 460.5:

> R-value measures resistance to heat flow.  R-values given in labels, fact sheets, ads, or other promotional materials must be based on tests done under the methods listed below.  They were designed by the American Society of Testing and Materials (ASTM).

Defendant contends that the R-values marketed for its Insultex wraps were derived from testing conducted in accordance with ASTM standards by accredited laboratories.  (Docket Nos. 1 ¶ 20; 7 ¶ 20).  The FTC believes that independent testing results obtained as part of an investigation indicate otherwise.  Consequently, the FTC filed a Complaint in this Court on November 3, 2016, alleging at Counts I through III therein that Defendant's R-value assertions are false or misleading due to a lack of valid, objective testing data in conformity with ASTM standards, and that Defendant has used materials disseminated to retailers as the means and instrumentalities of spreading its misrepresentations.  (Docket No. 1 ¶¶ 28 − 36).  The FTC seeks injunctive relief as well as other equitable relief aimed at disgorgement of allegedly ill-gotten profits.  (*Id.*).

A Case Management Conference was convened on December 21, 2016, and the Court issued a Case Management Order on December 22, 2016.  (Docket No. 13).  The Order included the following clause:

> 5. Pursuant to Local Rule LCvR 16.1(D), and to aid in the implementation of Fed. R. Evid. 502, the following is ordered in the event of an inadvertent disclosure of any privileged or trial preparation/attorney work product material:
>> a) The producing party shall promptly notify all receiving parties of the inadvertent production of any privileged or trial preparation material. Any receiving party who has reasonable cause to believe that it has received privileged

or trial preparation material shall promptly notify the producing party.

b) Upon receiving notice of inadvertent production, any receiving party shall immediately retrieve all copies of the inadvertently disclosed material and sequester such material pending a resolution of the producing party's claim either by the Court or by agreement of the parties.

c) If the parties cannot agree as to the claim of privilege, the producing party shall move the Court for a resolution within 30 days of the notice set forth in subparagraph (a). Nothing herein shall be construed to prevent a receiving party from moving the court for a resolution, but such motion must be made within the 30-day period.[1]

(*Id.* at 2 – 3). On March 20, 2017, the Court granted the parties' Stipulated Protective Order which provides, in part:

5. Confidential Material must be designated as follows:

a. Mark paper materials "CONFIDENTIAL-[DESIGNATING PARTY OR NON-PARTY NAME]." If paper material is only confidential in part, mark only the portions of the material that are confidential.

b. Mark electronic materials "CONFIDENTIAL-[DESIGNATING PARTY OR NON-PARTY NAME]." by marking each electronic page or subpart that is confidential. If the electronic material cannot be marked by page or subpart, the designee shall meet and confer with the recipient to determine a means to delineate the confidential material. Also mark the electronic storage medium, as well as any electronic file and folder name CONFIDENTIAL.

c. Designate deposition transcripts as Confidential Material within 10 days of receipt of the final transcript by identifying the specific page(s) and line number(s) that are confidential. If testimony is identified as confidential during a deposition, absent agreement on the scope of confidentiality, the entire transcript shall be treated as confidential until the time for designation expires.

6. *An inadvertent failure to mark Confidential Material prior to disclosure does not preclude a subsequent designation, but no prior disclosure of newly designated Confidential Material by a recipient shall violate this Order.*

---

[1] On or about April 20, 2017, Defendant was notified by email that privileged documents may have been inadvertently disclosed to Plaintiff. (Docket No. 26 at 2). On or about May 17, 2017, Defendant forwarded to Plaintiff a privilege log asserting privileges over the emails presently at issue. (*Id.*). Over the course of two separate telephone conversations, counsel for the parties were not able to resolve the issue of what privilege – if any – attached to the emails. (*Id.* at 3). The instant Motion followed on May 26, 2017. (*Id.*). Accordingly, it appears that the Motion was timely.

(Docket No. 16 at 2) (emphasis added).

Defendant filed a Motion to Determine Privilege on May 26, 2017, pertaining to three groups of emails which were allegedly inadvertently disclosed to the FTC, and which Defendant wishes to claw back in accordance with Federal Rule of Evidence 502. (Docket Nos. 24, 26). The FTC's Response was filed on June 7, 2017, and Defendant's Reply was filed on June 21, 2017. (Docket Nos. 33, 36). The FTC's Sur-reply was filed July 3, 2017. (Docket No. 38). The matter is ripe for disposition.

## III.  LEGAL STANDARDS

As an initial matter, where the jurisdiction of the federal court has been invoked based upon a question of federal law, all evidentiary privileges asserted by the parties to the case are subject to federal common law. *Swanger v. Warrior Run Sch. Dist.*, 659 F.App'x 120, 124 (3d Cir. 2016) (citing *Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000)). *See also* Fed. R. Evid. 501 ("The common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege…"). Thus, the Court will look to the decisions of other federal courts in the Third Circuit for guidance in this case.

### A. *Attorney-Client Privilege*

The United States Court of Appeals for the Third Circuit has held that the attorney-client privilege protects confidential communications between attorneys and clients which are made solely for the purpose of obtaining or providing legal assistance. *In re Grand Jury*, 705 F.3d 133, 151 (3d Cir. 2012) (citing *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007)). While such communications may contain both relevant and highly probative information, courts will not order production of same because of the broad public interest in encouraging "'full and frank communication between attorneys and their clients.'" *Id.* (quoting

*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  Confidential communications by corporate entities are entitled to the same protection afforded by attorney-client privilege as those of individual persons.  *United States v. Blumberg*, 2017 WL 1170851, at *2 (D.N.J. Mar. 27, 2017) (citing *Upjohn Co.*, 449 U.S. at 390).

The burden of establishing the privilege, by a preponderance of the evidence, rests with the party seeking its protection.  *United States v. Trombetta*, 2015 WL 4406426, at *16 (W.D. Pa. July 20, 2015) (Conti, J.).  The privilege will apply only if there was: "'(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.'"  *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011) (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 359).  "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d at 359 (quoting Restatement (Third) of the Law Governing Lawyers § 70).

### B.  Work Product Doctrine

Federal Rule of Civil Procedure 26(b)(3) governs application of the attorney work product doctrine.  *Travelers Prop. Cas. Co. of Am. v. USA Container Co., Inc.*, 2012 WL 12898823, at * 19 (D.N.J. Oct. 25, 2012).  It provides, in pertinent part, that:

(3) Trial Preparation: Materials.

> (A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> > (i)      they are otherwise discoverable under Rule 26(b)(1); and

> > (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> > (B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3)(A) and (B). The work product doctrine was born of the need to allow attorneys to prepare their cases without apprehension that their work product could be used against their clients in the future. *In re Grand Jury*, 705 F.3d at 151 (citing *In re Chevron Corp.*, 633 F.3d 153, 164 (3d Cir. 2011)). It precludes discovery of "'material prepared or collected by an attorney in the course of preparation for possible litigation.'" *Id.* (quoting *In re Grand Jury Investigation*, 599 F.2d 1224, 1228 (3d Cir. 1979)). The caveat, 'in anticipation of litigation,' encompasses any document "'prepared or obtained because of the prospect of litigation.'" *Serrano v. Chesapeake Appalachia, LLC*, 298 F.R.D. 271, 277 (W.D. Pa. 2014) (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979)). The party seeking the protection of this doctrine bears the burden of demonstrating that it applies. *Id.*

### C. Experts Not Expected to Testify

> Federal Rule of Civil Procedure 26(b)(4)(D) states as follows:

> (D) Expert Employed Only for Trial Preparation. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
> > (i) as provided in Rule 35(b); or
> > (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Fed. R. Civ. P. 26(b)(4)(D). In order to be considered such an "expert," an individual must "'fairly be said to have been obtained because of the prospect of litigation.'" *Bailey—P.V.S. Oxides, L.L.C. v. S and K Packaging, Inc.*, 2009 WL 1675763, at *2 (W.D. Pa. June 15, 2009) (Ambrose, J.) (quoting *In re Grand Jury Proceeding (EMC)*, 604 F.2d 798, 803 (3d Cir. 1979)).

## IV. DISCUSSION

In its Motion, Defendant asks the Court to examine three distinct sets of emails inadvertently disclosed to Plaintiff during the course of discovery in order to resolve whether said emails should be returned to Plaintiff or destroyed. The Court will now analyze all of these emails, in turn, to determine the applicability of attorney-client privilege, the attorney work product doctrine, and Rule 26(b)(4)(D) to each. The Court will then consider whether any of these protections were waived.

### A. Email Group 1 – Manni Emails

On March 7, 2016, two emails were exchanged between Dana Rosenfeld, John Thomas, and Randy Loew. (Docket No. 27 at 17 – 18). Rosenfeld and Thomas were both attorneys representing Defendant in conjunction with the FTC's investigation of Insultex. (*Id.* at 4). Loew was initially employed by Defendant to develop Insultex. (*Id.*). He has also allegedly been utilized by Defendant to prepare its defense against the FTC. [2] (*Id.*). The content of the Manni Emails pertained to the existence of documentation of testing data, and prior communications between Loew and an outside party regarding the testing of Insultex. (*Id.* at 4 – 5, 17 – 18). These emails were then forwarded to Defendant's President and Chief Executive Officer, Joseph Riccelli, on March 8, 2016. Attorney Thomas and Robert Manni, the owner of BRC Laboratories ("BRC"), were copied in under the subject line: "Do you believe this?" (*Id.*).

---

[2] The FTC does not dispute that Loew is Defendant's agent. (Docket No. 33 at 1 n. 1).

Defendant argues that these emails are protected by attorney-client privilege, the work product doctrine, and Federal Rule of Civil Procedure 26(b)(4)(D).

As to Defendant's claim of attorney-client privilege, the FTC contends that the Manni Emails are not covered for a number of reasons. To this end, the FTC argues that Manni was not an agent of Defendant and, although he was not a party to the first two emails in the chain, his inclusion in the third email waived the attorney-client privilege. (Docket No. 33 at 2 – 4). Defendant counters that Manni was a consultant hired for the purpose of preparing a defense against the FTC, and his communications are thus shielded by privilege because he is an agent or employee, or the functional equivalent.

As previously noted, corporations may invoke the protection of attorney-client privilege. "However, because 'as an inanimate entity, a corporation must act through agents,' unique problems arise with respect to the attorney-client privilege over statements made by agents of a corporation." *Blumberg*, 2017 WL 1170851, at *2 (quoting *Commodity Futures Trading Comm'n v. Wintraub*, 471 U.S. 343, 348 (1985)). This includes whether a consultant may be viewed as an agent or employee of a corporation for purposes of asserting the privilege. Courts in the Third Circuit have employed a "functional equivalent" doctrine to resolve this issue. *Smith v. Unilife Corp.*, 2015 WL 667432, at * 2 (E.D. Pa. Feb. 13, 2015) (citing *In re Flonase Antitrust Litig.*, 879 F.Supp.2d 454, 457 – 58 (E.D. Pa. 2012)).

Determining functional equivalence entails a broad, practical analysis of a consultant's relationship with a corporation. *Unilife Corp.*, 2015 WL 667432, at *2 (citing *Upjohn Co.*, 449 U.S. at 391 – 92). Accordingly, the Court should look to whether the consultant acted for the corporation, had a role similar to that of an employee, and/or was an integral member of a team assigned to handle an issue related to litigation. *In re Flonase Antitrust Litig.*, 879 F.Supp.2d at

459 – 60 (collecting cases). The Court must also consider whether the consultant possessed information needed by corporate attorneys in order to render legal advice. *Id.*

In his May 22, 2017, Declaration[3], Riccelli explains that Defendant hired Manni during the FTC's initial investigation in order to aid in preparation of a defense against any future claims by the FTC. (Docket No. 27 at 19). He acknowledges that Manni, and his company BRC Laboratories, had been previously engaged by Defendant to conduct the R-value testing of Insultex. (*Id.*). However, the new engagement was different; Manni was to consult with Defendant's non-testifying experts and attorneys to prepare responses to FTC inquiries, and assist with R-value testing of Insultex and with modifications to a machine used for R-value testing. (*Id.* at 19 – 20). Manni was, thus, considered to be part of a "defense team." (*Id.* at 19). This characterization of Manni's involvement with Defendant was reiterated in the Declaration by Loew[4], also dated May 22, 2017. (Docket No. 27). Loew noted that Manni was part of a defense team, with which he worked, and that communications between Manni and Defendant were understood to be confidential. (*Id.* at 22). Manni was included in the email chain at issue with the expectation of confidentiality. (*Id.*). Finally, the Court observes that Defendant disclosed to the FTC that Manni was being utilized as a consulting expert in a January 19, 2015, letter. (Docket No. 33-3 at 6).

In response, the FTC claims that this evidence is insufficient to demonstrate that Manni was the functional equivalent of an employee. To this end, the FTC points to Manni's April 2017 deposition, wherein he testifies to the following:

---

[3]     The FTC characterizes this declaration as "self-serving." (Docket No. 33 at 11). The FTC does not pursue this argument further. The Court acknowledges that an affidavit which is "'essentially conclusory' and lacking in specific facts is inadequate," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002) (quoting *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985)), but the Court finds the declaration sufficient and will give it consideration.

[4]     *See* footnote 3, *supra*.

> Q: What is BRC Laboratory's relationship to Innovative Designs?
> A: They are clients like the other 500 plus clients that I have.
>
> …
>
> Q: Mr. Manni, do you have any consulting arrangement with Innovative Designs?
> A: I stated earlier they are just a client like my other clients.
>
> …
>
> Q: Have you signed an agreement – have you signed a consulting agreement with Innovative Designs?
> A: No.
>
> …
>
> Q: You testified that you began your relationship with Innovative Designs in 2010; is that correct?
> A: Yes.

(Docket No. 33-1 at 2 – 3). According to the FTC, this testimony contradicts any assertion of functional equivalence between Manni and other employees of Defendant. Further, the FTC notes that there are no confidentiality or other agreements between Manni and Defendant, and that Defendant did not obtain affidavits from Manni or its attorneys to confirm the nature of Manni's work. As such, there is allegedly no way to verify Defendant's account of Manni's involvement during the FTC investigation.

However, this information – relied upon heavily by the FTC – does not necessarily disqualify Manni from consideration as the functional equivalent of an employee. Although no formal consulting agreement existed, and Manni had been involved with Defendant well before litigation was foreseeable, the record supports a finding that Manni was an integral member of a team assembled to address the FTC's investigation and subsequent lawsuit.[5] Indeed, his inclusion in *all* the email chains at issue in the instant Motion corroborates the Declarations to

---

[5]     *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, 2013 WL 4836752, at *7 (E.D. Pa. Sept. 11, 2013) (citations omitted) ("It makes little sense to impose additional requirements for extending the privilege to independent contractors merely because they are not on the payroll. The difference is only one of formality, and does not in itself diminish the need for the attorney and non-lawyer to collaborate to ensure that the corporation is complying with the law. Extending the privilege to a consultant performing a role similar to that of an employee, to the same extent as it applies to a corporate employee, simply 'reflects the reality that corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes.'").

the extent that Manni worked as part of a team, participated in conference calls, and consulted for the purpose of conducting additional testing and responding to FTC inquiries. Additionally, having conducted much of the original R-value testing for Insultex at his lab, Manni would clearly have information valuable to Defendant's attorneys in preparing to respond to, and/or defend against, the FTC. Consequently, the Court finds that Defendant has demonstrated that Manni was the functional equivalent of an employee.

The inquiry does not end, here, however; the FTC also argues that the Manni Emails were not made for the purpose of obtaining legal advice, and do not possess indicia of confidentiality or privilege. It is evident that Manni was not communicating with either Attorney Rosenfeld or Attorney Thomas, but was merely copied into the email chain by Loew. Yet, communications do not need to be authored by, or addressed to, an attorney to be withheld on grounds of attorney-client privilege. *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005). When a communication is shared by non-attorney employees for the purpose of relaying information requested by an attorney, privilege attaches. *Id.* This is also the case where transmission between non-attorneys is needed to communicate legal advice to the corporation. *Id.*

The most recent of the Manni Emails does not, overtly, appear to serve the purpose of gathering information necessary for Defendant's attorneys to provide legal counsel, or to disseminate advice throughout the company. *King Drug Co. of Florence, Inc.*, 2013 WL 4836752, at *8. When copied to Manni, the only information provided was in the subject line, which reads: "Do you believe this?" There is no indication as to how forwarding the emails to Manni served the purpose of aiding Defendant's attorneys in the provision of legal services and advice. Copying Attorney Thomas to the email does not save the communication, either. A

party cannot avail itself of the protection of attorney-client privilege simply because a communication was routed through or copied to counsel. *SmithKline Beecham Corp.*, 232 F.R.D. at 478 (citing *Andritz Sprout-Bauer, Inc. v. Beazer E., Inc.*, 174 F.R.D. 609, 322 (M.D. Pa. 1997)).

If email messages are sent as a matter of routine business practice, and not in furtherance of securing legal advice, the email messages are discoverable. *Rhoads Indus., Inc. v. Bldg. Materials Corp. of Am.*, 254 F.R.D. 238, 241 (E.D. Pa. 2008). Here, the first two of the Manni Emails from March 7, 2016 are correspondence between Attorney Rosenfeld, Attorney Thomas, and Loew, and include Attorney Rosenfeld's concern with the need to "rule things out," and the possibility that "conversion materials" were being applied "incorrectly," as well as her request for more information from Loew. Accordingly, the contents of these two emails constitute privileged communications made in furtherance of the provision of legal services to Defendant. However, the March 8, 2016 email in which Manni was copied does not enjoy this protection.

Alternatively, Defendant argues that the Manni Emails should be protected under the work product doctrine. Although the Manni Emails are not wholly covered by the attorney-client privilege, the Third Circuit has held that the email chain can still retain work product status. *In re Grand Jury Matter #3*, 847 F.3d 157, 165 (3d Cir. 2017). "The work product doctrine is governed by a uniform federal standard…and 'shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'" *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 661 – 62 (3d Cir. 2003) (quoting *United States v. Nobles*, 422 U.S. 225, 238 n. 11 (1975)).

While the Manni Emails make no explicit mention of preparation for litigation, and do not include any explicit legal analysis or guidance, as already noted, the March 7, 2016, emails

clearly make reference to Attorney Rosenfeld's concern with the need to "rule things out," and a possibility that "conversion materials" were being applied "incorrectly." In light of the backdrop of this case – that Defendant allegedly failed to properly represent the R-value of Insultex – it would appear that the emails initiated by Defendant's attorneys on March 7, 2016 during an FTC investigation pertaining to and discussing the adequacy of product testing constitute attorney work-product created in anticipation of litigation. *See Patel v. Kensol-Franklin, Inc.*, 2016 WL 1109874, at *4 (M.D. Pa. Mar. 22, 2016) (quoting *Rockwell Int'l*, 897 F.2d at 1255) (The determination as to whether or not a document was prepared in anticipation of litigation is often difficult; the Court must determine "'the state of mind of the party preparing the document.'"); (quoting *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1260 (3d Cir. 1993)) ("'This inquiry is limited by the requirement that the party's anticipation of litigation be objectively reasonable.'").

The same cannot be said for the March 8, 2016, email, and it will not enjoy protection from discovery. Nonetheless, to the extent that the contents of the March 7 emails were disclosed to Manni, attorney work product protection was not waived. *See Cooper Health Sys. v. Virtua Health, Inc.*, 259 F.R.D. 208, 215 (D.N.J. 2009) ("'The predicate of the waiver inquiry in the work-product context is not, as it is in the attorney-client context, whether the material was disclosed, but whether the material was disclosed to an adversary.'"). Accordingly, the content of the March 7 emails, as contained in the March 8 email, must be redacted.

Due to the protection afforded the Manni Emails pursuant to attorney-client privilege and the work-product doctrine, as well as this Court's finding that Manni is the functional equivalent of an employee, there is no need to address Defendant's argument pursuant to Rule 26(b)(4)(D).

**B. Email Group 2 – Calio Emails**

13

Between January and July 2016, a series of emails were exchanged between Vin Calio, Dana Rosenfeld, Ranajit Sahu[6], and Robert Manni. (Docket No. 27 at 24 – 28). The emails consist primarily of Calio's description of the manner in which he programmed software for testing of Insultex, and Attorney Rosenfeld, Sahu, and Manni's requests to speak with him further about same. In its brief, Defendant describes Calio as an employee of Custom Systems and Controls, Inc., who was initially responsible for creating and developing the software to test the R-value of Insultex. Defendant claims to have retained his services during the FTC investigation, and Calio made changes to the software at the direction of Attorney Rosenfeld in anticipation of potential litigation. (Docket No. 27 at 5). Defendant argues that these emails are protected by attorney-client privilege, the work product doctrine, and Federal Rule of Civil Procedure 26(b)(4)(D).

The FTC contends that – as with Manni – inclusion of Calio in the emails waived the attorney-client privilege because Calio was neither an agent of Defendant, nor the functional equivalent of an employee. The FTC notes that there is no evidence of a formal, written consulting or confidentiality agreement between Calio and Defendant. Moreover, no affidavits by Calio or Defendant's counsel were submitted to the Court to bolster claims that Calio was treated as an employee and hired for purposes of helping mount a defense against the FTC. The FTC argues that invoices from Custom Systems and Controls, Inc., purportedly show that Calio was nothing more than a software specialist providing maintenance and software modifications. As with Manni, the Court must determine whether Calio acted for the corporation, had a role similar to that of an employee, and/or was an integral member of a team assigned to handle an issue related to litigation. *In re Flonase Antitrust Litig.*, 879 F.Supp.2d at 459 – 60 (collecting

---

[6]     The FTC makes no argument regarding the employment status or functional equivalence of Ranajit Sahu.

cases). The Court must also consider whether Calio possessed information needed by corporate attorneys to assist with provision of legal counsel to Defendant. *Id.*

The substance of the Vin Calio Emails was Calio's description of his work for Defendant in programming testing software for Insultex. These emails were directed to Attorney Rosenfeld and Sahu. In one such email, Attorney Rosenfeld communicates the following to Calio:

> Thanks again for your help with this. Ron is visiting Harodite on Thursday and may need to reach out to you with questions relating to the data collection.

(Docket No. 27 at 25). Thus, while invoices for Calio's work do indicate that routine maintenance and programming was performed for Defendant (Docket No. 33-2), it would appear that Calio was also utilized and relied upon by Defendant's counsel and other members of Defendant's staff when conducting testing during the FTC investigation. Services provided include:

- "Development of a custom PC application to control and collect data from Thermal Testing Software" (Docket No. 33-2 at 6);
- "Software changes to existing system to support recent hardware changes" (*id.* at 7);
- "Work remotely with Bob [Manni] to resolve laptop communication issues. Also assist in adjusting R-Value calculation and add average R-Value calculation to Excel" (*id.* at 8);
- "Conference call with Randy [Loew] and Bob [Manni] to discuss software modifications" (*id.* at 9);
- "Conference call with Randy [Loew], Bob [Manni], and Ran [Sahu] to discuss changes" (*id.*); and,
- "On site at Harodite for meeting with Kurt Klavuhn and [R]ob Manni" (*id.*).

This evidence is in conformity with Riccelli's May 22, 2017, Declaration, in which he states that Calio was part of a defense team assembled to handle the FTC's investigation of Insultex, and that Calio vetted the accuracy and reliability of the testing apparatus, modified

testing software, and participated in conferences with Defendant's counsel and other consultants and employees to discuss strategy. (Docket No 27 at 19 – 20). It also demonstrates to the Court that Calio acted for Defendant as an integral member of a team handling matters related to litigation, and that he possessed information needed by Defendant's attorneys for provision of legal services. *In re Flonase Antitrust Litig.*, 879 F.Supp.2d at 459 – 60. In this Court's estimation, Calio is the functional equivalent of an employee for purposes of attorney-client privilege.

Inasmuch as the FTC argues that the Calio Emails were not created in an effort to aid in obtaining or providing legal advice, the Court observes that these communications were made in an attempt to provide Defendant's counsel and other employees with information regarding testing parameters and results. *See SmithKline Beecham Corp.*, 232 F.R.D. at 477 (privilege attaches to communications shared by non-attorney and attorney employees for purposes of relaying information needed for provision of legal advice to the corporation). The Calio Emails are, therefore, protected by attorney-client privilege.

Due to the protection afforded the Calio Emails pursuant to attorney-client privilege, as well as this Court's finding that Calio is the functional equivalent of an employee, there is no need to address Defendant's arguments with respect to the work product doctrine or Rule 26(b)(4)(D).

### C. Email Group 3 – Medeiros Email

On March 8, 2016, an email was sent by Loew to Attorney Thomas about testing protocols for Insultex, and why Defendant used a certain protocol as opposed to others. (Docket No. 27 at 29). Included in the email were Riccelli, Manni, and Ozzie Medeiros. Defendant describes Medeiros as an employee at Harodite Industries, Inc. (Docket No. 27 at 10). Medeiros

was allegedly retained by Defendant during the FTC investigation to modify the machine used to test Insultex. (*Id.*). Defendant argues that the Medeiros Email is protected by attorney-client privilege, the work product doctrine, and Federal Rule of Civil Procedure 26(b)(4)(D).

The FTC believes that inclusion of Medeiros and Manni in the email waived the attorney-client privilege because neither is an agent of Defendant, nor the functional equivalent of an employee. The Court has already addressed Manni. However, the FTC notes that Medeiros had no formal, written consulting or confidentiality agreement. Moreover, no affidavit by Medeiros or counsel was submitted by Defendant to bolster claims that he was treated as an employee and hired for purposes of helping mount a defense against the FTC.

Indeed, the Medeiros Email makes no mention of preparation for litigation, and does not include any legal analysis or guidance. Instead, it describes the testing protocol being used for Insultex, and explains why one testing configuration is used as opposed to another. (Docket No. 27 at 29). In his May 22, 2017, Declaration, Riccelli describes Medeiros as part of a team assembled for preparation of responses to, and/or a defense against, the FTC. (*Id.* at 19). Medeiros, specifically, was engaged to make modifications to the apparatus used for Insultex R-value testing, and made said modifications at the behest of Attorney Rosenfeld and other employees and consultants. (*Id.* at 21). Similarly, Loew explained in his Declaration that while Medeiros was an employee of Harodite, his services were secured to make modifications to the machinery used to test Insultex. (*Id.* at 22 – 23). Medeiros was copied into the March 8, 2016, email between he and Attorney Thomas, because Loew considered Medeiros to be part of the Defendant's defense team. (*Id.* at 23). The FTC also provided to the Court a copy of a June 25, 2015, email sent by Medeiros to Manni, and copied to Loew and another Harodite employee regarding work being performed. (Docket No. 33-2 at 12).

Given Medeiros's experience with making modifications to the testing machinery, based upon the direction of defense counsel and other employees and consultants, it would seem reasonable to include him in an email from Loew to Attorney Thomas describing why a particular testing protocol was followed. Medeiros's inclusion supports the argument that he was part of the defense team. It is also indicative of his possession of information helpful to defense counsel in rendering legal advice. *In re Flonase Antitrust Litig.*, 879 F.Supp.2d at 459 – 60. Medeiros is, therefore, properly considered the functional equivalent of an employee for purposes of the instant Motion. Likewise, it is not a stretch to conclude that the Medeiros Email was made for the purpose of aiding in the provision of legal services to Defendant. *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. at 477. Medeiros's inclusion in the email does not change the nature of the communication or strip it of its privilege.

Due to the protection afforded the Medeiros Email pursuant to attorney-client privilege, as well as this Court's finding that Medeiros is the functional equivalent of an employee, there is no need to address Defendant's arguments with respect to the work product doctrine or Rule 26(b)(4)(D).

### D. Waiver

In its final arguments pertaining to the three emails chains presently at issue, the FTC contends that the attorney-client privilege and work-product protections were waived when: (1) Defendant voluntarily provided various communications between its employees and Manni, Calio, and Medeiros to the FTC during its initial investigation; and (2) Defendant placed the subject matter of the Manni Emails, the Calio Emails, and the Medeiros Email at issue in its second and third affirmative defenses. (Docket No. 33 at 14 – 17). As to the first argument, it is well-settled that "the disclosure of work product to government agencies that were potential

adversaries in order to convince them to take no action or a more lenient course of action waived the privilege 'as against all other adversaries.'" *Mine Safety Appliances Co. v. North River Ins. Co.*, 73 F.supp.3d 544, 570 (W.D. Pa. 2014) (quoting *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991)). "[A]ny privilege attaching to the materials and testimony that have been produced has been waived." *Id.* at 576. In fact, under certain circumstances, protection may be waived for all communications on the same subject, whether or not previously disclosed. *Id.* at 572.

To this end, Federal Rule of Evidence 502(a) states as follows:

> (a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver. When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>> (1) the waiver is intentional;
>> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>> (3) they ought in fairness to be considered together.

The Advisory Committee Notes further provide that while "a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those *unusual situations* in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502 Advisory Committee Notes (Revised November 28, 2007) (emphasis added).

The FTC does not claim that any of the emails previously furnished by Defendant during the FTC investigation included the Manni Emails, the Calio Emails, or the Medeiros Email[7]. What the FTC has presented to the Court is a number of emails between Loew, Riccelli, Manni, Calio, Medeiros, and several other individuals working for Defendant. (Docket No. 33-2 at 11 – 15). One of these emails pertains to whether a particular piece of equipment was previously used to test Insultex; another pertains to Medeiros's update to a wiring diagram and receipt of "certs of compliance;" and, others pertain to payment of various invoices. (*Id.*). None contain expressions of legal opinions or conclusions. None involve any of Defendant's attorneys.

The evidence before the Court does not show that the previously undisclosed Manni Emails, Calio Emails, or Medeiros Email concern the same subject matter as other disclosed communications, or that the protection afforded by attorney-client privilege and attorney work product should now be waived because Defendant intentionally placed other "protected information into the litigation in a selective, misleading, and unfair manner." *Johns Hopkins Univ. v. Alcon Laboratories, Inc.*, 2017 WL 3013249, at *2 (D. Del. July 14, 2017) (citation omitted). Accordingly, there will be no waiver pursuant to Rule 502(a).

Yet, the FTC argues that waiver may still have been effectuated because Defendant relies upon privileged communications to support its second and third affirmative defenses. The United States Court of Appeals for the Third Circuit has held that the attorney-client privilege is waived when the advice of counsel is placed at issue in a claim or defense. *Emmanouil v. Roggio*, 499 F.App'x 195, 201 (3d Cir. 2012) (citing *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994)) ("The advice of counsel is placed in issue where the client…attempts to prove that claim or defense by disclosing or describing an attorney client

---

[7]     During a recent conference, counsel for both parties advised that the subject email correspondence was not previously produced during the course of the FTC investigation, although other email correspondence among these individuals was. (Docket No. 49).

communication."). The FTC does not maintain that Defendant has made the advice of its attorneys an issue in any of its affirmative defenses.

Defendant's second affirmative defense states as follows:

> IDI has acted, at all times alleged in the Complaint, in good faith in all of its marketing practices and claims and *reasonably and justifiably relied upon the results of the Laboratory*. The Laboratory has employed the most modern and scientific appropriate testing methods, equipment, protocols and procedures to determine the R-value of Insultex House Wrap. IDI took affirmative steps and actively engaged with the FTC, the Laboratory and the experts to determine and understand the FTC's complaints and test results and the Laboratory's test results. At great time, effort and expense to IDI, the Laboratory modified its testing methods on several occasions as a result, and consistently found that Insultex House Wrap has an R-value of R-3 or R-6. Those certified test results verify that Insultex House Wrap does, in fact, possess an R-3 or R-6 rating and are the product of competent and reliable scientific testing. *IDI reasonably and justifiably relied upon the hundreds of tests performed by the Laboratory*, which became accredited specifically in testing house wraps for R-value using the ASTM C518 and ASTM C518 Modified method.

(Docket No. 7 at 9) (emphasis added). Defendant's third affirmative defense provides:

> IDI actively engaged and cooperated with the FTC during its investigation in this matter. IDI requested that the FTC accept modification of the testing procedures due to the innovative nature and thinness of the Insultex House Wrap and permit the ASTM C518 Modified method. IDI presented competent and reliable scientific substantiation for the necessity of the ASTM C518 Modified method. The FTC arbitrarily and capriciously denied IDI's request without reliable scientific substantiation. *The ASTM C518 Modified test method as employed by the Laboratory is the appropriate scientific testing method* for Insultex House Wrap.

(Docket No. 7 at 10) (emphasis added). While Defendant certainly places the reasonableness of its reliance upon BRC at issue in the affirmative defenses, there is no mention of the advice of counsel or the use of attorney-client privileged communications to support these defenses. The FTC cites to *Mine Safety Appliances Co.*, for the proposition that a "party can waive the

attorney-client privilege by asserting claims or defenses that place privileged communications at issue." 73 F.Supp.3d at 571. However, the district court in *Mine Safety Appliances Co.* goes on to specify that this occurs when the "advice of counsel" is placed at issue. *Id.* at 572. Where the advice of counsel has not been interjected as an essential element of a claim or defense, attorney-client privilege is not waived. *In re Processed Egg Prods. Antitrust Litig.*, 2014 WL 6388436, at *9 (E.D. Pa. Nov. 17, 2014) (citing *Rhone-Poulenc Rorer Inc.*, 32 F.3d at 864).

Once again, there is no mention of the advice of Attorney Rosenfeld, Attorney Thomas, or any other attorney engaged in the defense of the FTC matter in the Defendant's affirmative defenses, nor is there a reference to the Manni Emails, the Calio Emails, or the Medeiros Email. Even if these emails contain information relevant to the affirmative defenses, "[r]elevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue." *Rhone-Poulenc Rorer Inc.*, 32 F.3d at 864. Moreover, a "privilege is not waived 'merely by taking a position that privileged communications might contradict.'" *In re Processed Egg Prods. Antitrust Litig.*, 2014 WL 6388436, at *9 (quoting *United States v. Salerno*, 505 U.S. 317, 323 (1992)).

Further, the FTC has not demonstrated to the Court that the facts contained in the disputed emails cannot be obtained by any other means. Facts discussed by Defendant and its attorneys and consultants "must be disclosed in discovery, but the communications that take place" are privileged. *Rhoads Indus., Inc.*, 254 F.R.D. at 241. Accordingly, putting the reasonableness of its reliance upon the results obtained by BRC does not waive Defendant's attorney-client privilege, even if privileged communications contain information pertaining to the testing of Insultex.

## V.     CONCLUSION

Based upon the foregoing, Defendant's Motion is granted, in part, and denied, in part. The March 8, 2016 communication in the Manni Emails is subject to discovery, with the exception of any information pertaining to the March 7, 2016 communications contained therein. The remainder of the emails presently at issue, and any copies thereof, shall be returned or destroyed by the FTC forthwith.  An appropriate Order follows.

*/s/ Nora Barry Fischer*
Nora Barry Fischer, U.S. District Judge

Date:   September 28, 2017.
cc/ecf: All counsel of record.