# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION, )
)
Plaintiff, )
)
v. ) Civil Action No. 16-1669
) Judge Nora Barry Fischer
INNOVATIVE DESIGNS, INC., )
)
Defendant. )

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 6, 2018, the Court convened oral argument on Defendant Innovative Designs, Inc.'s ("IDI") motion to disqualify Plaintiff Federal Trade Commission's ("FTC") expert. (Docket Nos. 65, 79, 92).[1] A week later, IDI submitted supplemental deposition excerpts. (Docket No. 84). After considering the parties' written submissions and oral arguments, (Docket Nos. 66, 75), the Court entered an Order on February 21, 2018 denying IDI's motion to disqualify. (Docket No. 87). In the meantime, IDI filed its pending redacted and sealed motion for protective order to designate information as confidential material on February 12, 2018, (Docket Nos. 85, 86), and the FTC filed its redacted and sealed objection to same on February 23, 2018, (Docket Nos. 91, 92).

The Court now enters the instant Memorandum Opinion setting forth the basis for its Order denying IDI's motion to disqualify. (Docket No. [87]). This Memorandum Opinion will also address IDI's related motion for protective order. (Docket No. 86). For the reasons that follow, IDI's motion for protective order [86] is also DENIED.

---

[1]	The FTC ordered preparation of the transcript, (Docket No. 79), which was subsequently filed on March 2, 2018, (Docket No. 92).

## II. BACKGROUND

The FTC filed a three-count complaint against IDI on November 3, 2016 under Section 5(a) of the FTC Act, 15 U.S.C. § 45(c), claiming that since November 2011, IDI has made false and/or unsubstantiated claims in marketing the "R-value" of its Insultex House Wrap ("Insultex").[2] (Docket No. 1). As set forth in the pertinent FTC regulation:

> R-value measures resistance to heat flow. R-values given in labels, fact sheets, ads, or other promotional materials must be based on tests done under the methods listed below. They were designed by the American Society of Testing and Materials (ASTM).

16 C.F.R. § 460.5. The relevant test for purposes of this litigation is ASTM C518: "Standard Test Method for Steady-State Thermal Transmission Properties by Means of the Heat Flow Meter Apparatus." (*Id.*).

In its marketing materials, IDI described its Insultex product as "THE ONLY HOUSE WRAP WITH AN R VALUE." (Docket Nos. 1 and 7 at ¶ 11). It also advertised that, based upon valid testing conducted in certified laboratories under strict controls, Insultex has an R-value of either "R-3" or "R-6," depending on the thickness of the material, meaning that consumers would enjoy reduced home energy costs if they chose Insultex over other house wraps. (*Id.* at ¶¶ 13, 17-18, 20).

The FTC brought this lawsuit asserting that the above-described marketing claims are unsubstantiated and not established by testing. (Docket No. 1 at ¶¶ 22, 23). In its answer, however, IDI stands by the statements made in its marketing materials:

> Insultex House Wrap is a unique and state of the art product. IDI has devoted substantial time, effort and expense to fully vet Insultex House Wrap, both prior to marketing the product with the R-value performance claims and subsequent to the initiation of the instant

---

[2] According to the pleadings, house wrap is a weather-resistant barrier designed to prevent rain from penetrating, but to allow water vapor from inside the house to escape, so that moisture does not accumulate inside the wall. (Docket Nos. 1 and 7 at ¶ 10).

Complaint, and to obtain R-value testing results from an ISO accredited laboratory (hereinafter sometimes referred to as the "Laboratory"). Insultex House Wrap has undergone rigorous testing and hundreds of tests by the Laboratory employing differing variables under various conditions. Those certified test results verify that Insultex House Wrap does, in fact, possess an R-3 or R-6 rating. IDI has received numerous unsolicited testimonials from very satisfied customers relating to Insultex House Wrap. These specific testimonials substantiate IDI's assertions that Insultex House Wrap does, in fact, deliver superior energy efficiency over products marketed by competitors. IDI's promotional materials and marketing statements are the product of, and were at all times material hereto made in reliance upon, competent and reliable scientific testing. IDI reasonably relied on those testing results of the Laboratory in marketing Insultex House Wrap as possessing R-values of R-3 or R-6 and providing energy savings for consumers…

(Docket No. 7 at ¶ 2). The laboratory to which IDI refers in its answer is BRC Laboratory ("BRC"). (Docket No. 66 at 2). IDI has spent more than $300,000 to build a testing unit in order for BRC to become accredited. (Docket No. 75-24 at 6-7).

Fact discovery is complete and the parties are now in the expert discovery phase of the case. (Docket No. 60, 87). The FTC has designated David W. Yarbrough, PhD, PE, as its expert in the field of thermal insulation and building materials. (Docket No. 75 at 2). Yarbrough holds a PhD in Chemical Engineering from the Georgia Institute of Technology. (Docket No. 75-4). In 1994, Yarbrough co-founded R&D Services, Inc. ("R&D"), a leading independent insulation testing laboratory. (*Id.*). R&D conducts thousands of tests per year, including hundreds of ASTM C518 tests to determine a product's R-value, for a broad array of clients throughout the entire insulation industry. (Docket No. 75-22 at 5-6). In 2011, Yarbrough sold his interest in R&D and became its employee. (*Id.*). As R&D's employee, Yarbrough's role involves testing products, as well as consulting and acting as an expert. (*Id.*).

Although Yarbrough is currently listed as the FTC's expert in this case, he previously conducted testing on IDI's Insultex product as an employee of R&D. (Docket No. 66-7 at 1-5, 75-

24 at 7). To this end, IDI executed two contracts with R&D, one in July 2012 and another in April 2013, in which IDI retained R&D to conduct ASTM C518 tests on Insultex to verify BRC's test results. (*Id.*).

The first testing contract concerned two thermal resistance measurements, for which IDI paid R&D $750. (Docket No. 66-7 at 2). The second testing contract focused on a single thermal resistance measurement, for which IDI paid R&D $400. (*Id.* at 4). IDI's CEO, Joseph Riccelli ("Riccelli"), signed both contracts. (*Id.* at 3, 5). Each contract contained a confidentiality provision precluding R&D "from voluntarily disclosing to third parties information about [IDI's] products or test results which are not already known to [R&D], already available to the public, or unless by judicial or court proceedings." (*Id.*). According to the FTC, this is a standard contract which R&D requires all clients, including long-term clients, to execute before it will conduct testing for a client. (Docket No. 74-22 at 7). It is undisputed that said nondisclosure provisions apply to all conversations that Yarbrough had with IDI about the results from the three thermal resistance measurement tests he conducted for IDI. (Docket Nos. 66-2 at 5; 66-10 at 103-04).

Before executing each contract, IDI's consultant, Randy Loew ("Loew"), had discussions about conducting the described thermal resistance measurement tests with R&D's President, Stuart Ruis ("Ruis"), and Yarbrough. On July 19, 2012, Loew sent Ruis the following message:

> **Subject:** testing
>
> Dear Stuart [Ruis],
>
> Please send Joe Riccelli [IDI's CEO] and myself the following:
>
> 1. a copy of the contract
> 2. quantity of test material you need
> 3. date the testing will be completed
>
> ALSO, please phone the test results to us before committing it to writing.

***

> PLEASE test only one layer of our material for ASTM C518 as discussed with Dave [Yarbrough] and another single layer of our Insultex with air gaps on one side of 1/16" and the other side of 1/4". We do not want multiple layers tested. If you have any questions, please call me.
>
> Regards,
>
> Randy

(Docket No. 66-3). Later that day, Ruis replied to Loew, as follows:

> **Subject:** revised quote
>
> Randy
>
> I have attached a revised quote to perform the thermal resistance tests we have discussed. Please sign and return to me at your convenience. The price increased from $50 from the last quote due to the extra preparation that will be needed to build test frames to create air spaces around your sample. Please feel free to contact me if you have any questions. We will get started as soon as we receive materials, documentation and payment. Any future work can be done by PO. Thank you.
>
> Stuart

(Docket No. 66-4).

On July 23, 2012, Loew e-mailed Ruis certain specifications for conducting the testing, (Docket No. 66-5), and Riccelli signed the first testing contract, (Docket No. 66-7). Riccelli later stated during his deposition: "I hear about R&D Services being this lab that is the lab that knows what they're doing and I'm figuring, you know what, I spent all this money, what's another $750 to have them see what they get, you know, and it was the same as everyone else using the standard C518 method." (75-24 at 7).

On April 23, 2013, Ruis sent Loew and Riccelli the following e-mail regarding the results from the second testing contract:

> All
>
> I have attached [the] report … containing the R value and emittance test results for the product you submitted.  Please review and we can discuss the results and how to improve on the R value.  Dave [Yarbrough] should be back in the office tomorrow, and we will discuss the project then.  Thank you for your business!
>
> Stuart

(Docket No. 66-9).

Apart from his conversations with Ruis, Loew asserts in an affidavit that he had conversations with Yarbrough, wherein he disclosed confidential information about Insultex, including information about how it was made and its unique composition.  (Docket No. 66-1 at ¶¶ 10-15).  Yarbrough, on the other hand, submitted a counter-declaration in which he denies that Loew provided him with a detailed description of Insultex's design, composition, or chemical mix before he performed the testing on Insultex.  (Docket No. 75-20 at ¶¶ 3-5).  When questioned during his deposition about the conversation that he had with Loew prior to execution of the second testing contract, Yarbrough responded:

> My recollection is that Mr. Loew described very briefly that he had a product that he had helped develop, or maybe he had developed, that he wanted to use or market as a house wrap.  It was fairly thin and he wanted to achieve an R3, and he wanted to know if we could -- I think he wanted to know if we could test this material.
>
> I said yes, we can test it, but achieving an R3 with one-millimeter thick piece of material is problematic.
>
> So he asked what does that mean.  I said, you can't do it.  He said, well, how can I do it? And I -- judging from the letter, it looks like I suggested to him that we could -- he could conceive of an assembly that could achieve an R value, much like reflective insulation

manufacturers use enclosed reflective air spaces to achieve R values. It's a well-established industry.

He said, well, can you test it? I said, yes. I have a way of rotating C518 so that you can make a horizontal heat flow measurement, which would be appropriate for walls.

If you're going to have a reflective air space, you've got to measure in the direction of heat flow of your application. So you can't get a reliable value heat flow up and down if the actual heat flow direction is going to be horizontal. So years and years and years ago, I built a device to rotate the 518 apparatus to get horizontal heat flow. And I was trying help him. He said, okay.

And then in this letter I see that he wanted to talk about relatively small spaces, 1.25 inches. And I see that I drew a diagram up here to remind me of what that discussion was about of an air space of 1.25 inches with material on one side.

So this would be an assembly conceivably that used his membrane with spacers to produced [sic] a 1.25-inch enclosed air space to be measured horizontally. And I guess I showed this to Stuart [Ruis] and I said, you know, can you do this? And, of course, we can do it.

So it was a discussion on the telephone followed by this letter in which I had attempted to do what I do, that is how can I change this product into something that has a chance to work.

(Docket No. 66-2 at 3-4).

The letter to which Yarbrough refers in the above excerpt is dated April 8, 2013. (Docket No. 66-8 at 2). Loew sent this letter to Yarbrough to reiterate some testing instructions, provide the contact information of IDI's CEO, Riccelli, and to apprise Yarbrough that additional testing may be necessary, "[i]f the results are not good." (*Id.*). Yarbrough maintains that his brief communications with Loew in advance of testing were "routine" and no different than the usual conversations he has with all prospective R&D clients. (Docket No. 75-20 at ¶ 2).

R&D delivered its completed thermal resistance test reports to IDI on July 25, 2012 and April 23, 2013, respectively. (Docket No. 66-6 at 2-7). The FTC's investigation into IDI's

marketing of Insultex's purported R-values did not begin until December 2014. (Docket No. 75 at 4).

Notwithstanding Yarbrough's prior testing of Insultex, the FTC retained him as its expert in September 2016 as part of the investigation (and ultimate prosecution of this lawsuit). (Docket No. 75-2 at § 1.2). At that time, no individual from R&D considered whether the FTC's retention of Yarbrough would create a conflict, and R&D did not disclose this fact to the FTC. (Docket No. 92 at 9-10, 47-48).

The FTC provided portions of Yarbrough's draft expert report, which was on R&D letterhead, to IDI during confidential prelitigation settlement negotiations in October 2016. (Docket No. 75-25 at 3). The FTC initiated this action in November 2016, (Docket No. 1), and this Court convened a Rule 16 case management conference on December 21, 2016. (Docket No. 14). Together with counsel, IDI's CEO, Riccelli, and one of its board members, Robert Monsour, attended in person. (*Id.*). As set forth in the Court's minute entry, Yarbrough was identified as the FTC's expert during the proceeding. (*Id.*). No objection to Yarbrough being the FTC's expert was made at that time, notwithstanding that Riccelli certainly would have known of his July 2012 and April 2013 testing of Insultex, in light of the above correspondence. (*Id.*). Thereafter, on March 20, 2017, the Court entered the parties' stipulated protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. (Docket No. 16).

IDI also did not object to Yarbrough attending the entirety of a two-day deposition and inspection of BRC in Taunton, Massachusetts in mid-April 2017. (Docket No. 75 at 7). During a telephone conversation a few weeks prior to said inspection and deposition, IDI's counsel told the FTC's counsel that Yarbrough may be subject to a confidentiality agreement. (Docket Nos. 66 at 13, 75 at 7). The FTC's counsel sent a follow-up email on April 3, 2017, attaching the agreement

and asking "is this the NDA between R&D and IDI that you referred to last week?"; but, IDI's counsel did not respond.  (Docket Nos. 66-11 at 2, 75 at 7 n. 10).

Then, during the deposition and inspection on April 18, 2017, counsel for the parties contacted the Court by telephone to resolve a dispute.  (Docket Nos. 17-19).  The FTC sought to have BRC test an unidentified product sample which Yarbrough brought with him; however, IDI's counsel objected.  (*Id.*).  After hearing from the parties, the Court denied the FTC's request to compel BRC to test the product, without prejudice, and instructed counsel for the FTC to file an appropriate motion, with the notice of the deposition/investigation, as well as the identity and specifications of the sample material, attached thereto.   (Docket No. 18).[3]

Relevant here, IDI's counsel confirmed during the April 18 telephonic proceeding that IDI knew of Yarbrough's prior testing of its Insultex product:

> We don't take their expert's word on it because, quite frankly, we have a confidentiality agreement with their expert who tested our material back in 2012 and came up with the same results that we did. After that happened, after we do this and enter into this confidentiality [agreement], he turns out to be the FTC expert. So we're not taking their expert's word for anything.

(Docket No. 19 at 6).  Based on same, the Court remarked that "it sounds … like [IDI] is also throwing down the conflict challenge to Dr. Yarbrough."  (*Id.* at 11).

Nonetheless*,* IDI did not inform the FTC that it was actually contemplating moving to disqualify Yarbrough until June 22, 2017.  (Docket Nos. 66 at 13; 75 at 7, 75-22 at 2-4).  In an eleven-paragraph email dated July 5, 2017, the FTC's counsel set forth why he believed that there is no legal or factual basis for disqualification.  (Docket No. 75-22 at 2-4).  IDI's counsel, again, did not respond.  (Docket No. 75 at 7).

---

[3]    The FTC did not subsequently file such motion.

The FTC's counsel provided IDI with Yarbrough's expert reports along with the related Rule 26(a)(2) expert disclosures on August 11, 2017, (Docket No. 75-2-19), and IDI deposed him on September 12, 2017, (Docket Nos. 66-2; 75-21). In Yarbrough's "Expert Report on the Thermal Performance of Thermal Insulation Products from Innovative Designs, Inc," he ultimately concludes that "[t]he R-values advertised and placed on product labels by Innovative Designs, Inc. were not determined in accordance with ASTM C518" and that BRC's testing was replete with deficiencies. (Docket No. 75-2 at 1, 16-21, 25).

Having set forth the relevant background and procedural history, the Court turns to IDI's motion to disqualify and motion for protective order. (Docket Nos. 65, 86).

## III.     DISCUSSION

### A.     MOTION TO DISQUALIFY EXPERT

IDI argues that the Court should disqualify Yarbrough from "serving as the FTC's testifying expert in this case because he was a consultant for IDI pursuant to the terms of a confidentiality agreement during the research and development phase of Insultex House Wrap and IDI disclosed confidential information to him." (Docket No. 66 at 2). According to IDI, Yarbrough has a "clear and fundamental conflict from serving as the FTC's expert" because "the very same issues on which Yarbrough was hired to advise IDI are the very same issues that the FTC has hired him to testify [about] in the instant case." (*Id.*) (emphasis removed). The FTC counters that the Court should deny IDI's motion for disqualification because Yarbrough and R&D had limited dealings with IDI, which only related to testing IDI's product, not consultation, long before the FTC's investigation began, and that all information that IDI disclosed was either publically-available or discoverable, i.e., not confidential. (Docket No. 75 at 1-2).

This Court has the inherent power to disqualify an expert who has a conflict of interest. *McClellan v. Ready Mixed Concrete Co. of Erie, Inc.*, 2014 WL 4060254, at *4 (W.D. Pa. 2014). This power derives from the Court's "duty to preserve confidence in the fairness and integrity of judicial proceedings, and to protect privileges which may be breached if an expert is permitted to switch sides in pending litigation." *U.S. ex rel. Cherry Hill Convalescent, Inc. v. Healthcare Rehab Sys., Inc.*, 994 F.Supp. 244, 248 (D.N.J. 1997). That said, "[d]isqualification of an expert witness is a drastic measure that is imposed reluctantly." *Weaver v. Mobile Diagnostech, Inc.*, 2009 WL 1230297, at *9 (W.D. Pa. 2009).

"Because experts and attorneys perform different functions in litigation, the standards and presumptions applicable to the attorney-client relationship have little bearing on an expert's disqualification." *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 580 (D.N.J. 1994). District courts in the Third Circuit apply the following two-step inquiry to determine whether expert disqualification is appropriate: (1) was it objectively reasonable for the party seeking disqualification to have concluded that a confidential relationship existed with the expert? and, (2) did that party disclose any confidential information to the expert? *Cherry Hill,* 994 F.Supp. at 249; *Weaver*, 2009 WL 1230297, at *9. "If only one of these two factors is present, disqualification likely is inappropriate." *Syngenta Seeds, Inc. v. Monsanto*, 2004 WL 2223252, *1 (D.N.J. 2004). "The party moving for disqualification bears the burden of proof with respect to each of these factors." *Id.* In this regard, a party seeking disqualification must present more than conclusory assertions to carry its burden. *Rodriguez v. Pataki*, 293 F.Supp.2d 305, 312 (S.D.N.Y. 2003).

Beyond the above two-step inquiry, district courts balance competing policy objectives and concerns of fundamental fairness. *Butamax Adv. Biofuels LLC v. Gevo, Inc.*, 2012 WL 4815593, *2 (D. Del. 2012). Preventing conflicts of interest and maintaining judicial integrity are factors

that weigh in favor of disqualification, while maintaining accessibility to experts with specialized knowledge and encouraging experts to pursue their professions are factors that weigh against disqualification. *Id.*

In determining the reasonableness of a party's conclusion that a confidential relationship existed for purposes of the first step of this inquiry, "courts consider several factors, including: (1) the length of the relationship and the frequency of contact; (2) whether the moving party funded or directed the formation of the opinion to be offered at trial; (3) whether the parties entered into a formal confidentiality agreement; (4) whether the expert was retained to assist in the litigation; (5) whether the expert was paid a fee; and (6) whether the expert was asked to agree not to discuss with opposing parties or counsel." *Syngenta*, 2004 WL 2223252, at *2. Here, there is no dispute that Yarbrough was subject to the confidentiality provision set forth in the July 2012 and April 2013 testing contracts. (Docket No. 66-7 at 3, 5).[4] Despite same, the FTC contends that no confidential relationship existed between IDI and Yarbrough in light of the other facts in the record, including the nature of the testing contracts, the limited dealings between Yarbrough and IDI, the small amount that IDI paid to R&D for testing, and the fact that IDI did not fund Yarbrough's expert opinion herein. (Docket No. 75 at 11-15).

"The objectively reasonable belief of a confidential relationship is not a 'high hurdle' for the moving party to clear." *Novartis AG v. Apotex, Inc.*, 2011 WL 691594, *2 (D.N.J. 2011), *Report & Recommendation adopted,* 2011 WL 611706 (D.N.J. 2011). This is particularly true where, as here, there is a confidentiality agreement between the expert and the party seeking disqualification. *See Butamax*, 2012 WL 4815593, at *3 ("For purposes of this analysis, I will

---

[4]     Both Yarbrough and R&D's President, Ruis, acknowledged this fact during their depositions. (Docket Nos. 66-2 at 5; 66-10 at 103-04).

assume that a confidential relationship existed … based upon the executed confidentiality agreement.").  Accordingly, while there are some factors in the record that may weigh against the finding of a confidential relationship, the Court will assume that, in light of the confidentiality provisions in the testing contracts, it was objectively reasonable for IDI to have concluded that such a relationship existed with Yarbrough.  *Id.*  However, "[t]he existence of a confidential relationship does not end the inquiry," *Cherry Hill*, 994 F.Supp. at 250, because expert disqualification is inappropriate if the second step of this inquiry is not answered in the affirmative. *Syngenta*, 2004 WL 2223252, at *2.

The second step of the inquiry asks whether IDI disclosed confidential information to the expert.  *Weaver*, 2009 WL 1230297, at *9.  In this context, confidential information includes a discussion of the retaining party's strategies in the litigation, the kinds of experts the party is expected to retain, the party's views of the strengths and weaknesses of each side, the role of each of the party's witnesses to be hired, and anticipated defenses.  *Cherry Hill*, 994 F.Supp. at 250 (quoting *Koch Refining Co. v. Bourdeaux MV*, 85 F.3d 1178, 1181 (5th Cir. 1996)).  Merely disclosing confidential business or financial records to an expert is not a valid basis for disqualification.  *Id.* at 251; *see also Weaver*, 2009 WL 1230297, at *10.  Instead, the confidential communications or disclosures must pertain to the present litigation.  *Novartis*, 2011 WL 691594, at *3-4; *Weaver*, 2009 WL 1230297, at *10; *Syngenta*, 2004 WL 2223252, at *2.

IDI concedes that it cannot satisfy this definition of "confidential information" because its communications with R&D and Yarbrough do not pertain to the present litigation.  (Docket No. 66 at 10); (Docket No. 92 at 4-5).  While the relevant communications in this case occurred in July 2012 and April 2013, the FTC subsequently began its investigation in December 2014, retained Yarbrough in September 2016, and filed this action in November 2016.  (Docket Nos. 1, 66-3-5,

66-8-9, 75-23 at 3). As such, because the relevant communications did not occur during the pendency of this litigation or relate to same, IDI plainly cannot satisfy the second step of this inquiry. *Cherry Hill,* 994 F.Supp. at 250. In light of said failure, the Court finds that IDI's motion to disqualify must be denied. *See, e.g., Weaver,* 2009 WL 1230297, at *10 (refusing to disqualify the expert when the disclosures occurred years before the litigation).

After all, expert disqualification constitutes a drastic sanction which courts impose reluctantly. *Butamax,* 2012 WL 4815593, at *3; *Weaver,* 2009 WL 1230297, at *9. This Court cannot disregard and/or modify the applicable definition of confidential information in this context merely because IDI feels that its application is too narrow under the circumstances. (Docket No. 66 at 10). Besides, even if the Court were to adopt IDI's expanded definition of confidential information, the Court would nevertheless conclude that IDI has failed to satisfy same on the record before the Court. To this end, IDI proposes, without citing any authority, that confidential information in this context should not only include information that was disclosed to an expert during the pending litigation, but also "disclosures made to a consultant that was retained to assist compliance with government regulations when that consultant is later hired by the regulating body enforcing those very same regulations." (Docket No. 66 at 10).

As the movant, IDI bears the "burden of pointing to specific and unambiguous confidential disclosures" that it made to Yarbrough or R&D which, if revealed, would prejudice IDI. *Syngenta,* 2004 WL 2223252, at *3; *Eastman Kodak Co. v. Kyocera Corp.,* 2012 WL 4103811, at *8 (W.D.N.Y. 2012). Conclusory assertions, unproven statements, or generalized and vague allegations do not satisfy this burden. *Greene, Tweed of Del., Inc. v. DuPont Dow Elastomers, LLC,* 202 F.R.D. 426, 429 (E.D. Pa. 2001); *Novartis,* 2011 WL 691594, at *4; *Rodriguez,* 293 F.Supp.2d at 312. In the same vein, courts refuse to disqualify an expert if the disclosures involved

publicly-available information, *Greene,* 202 F.R.D. at 430, or information that is otherwise discoverable, *Cherry Hill*, 994 F.Supp. at 250-51.

IDI supports its motion with a declaration from its consultant, Randy Loew, wherein he maintains that IDI retained Yarbrough for consultation on "methods and/or ways to improve upon the R-value of Insultex House Wrap" during the "research and development and/or vetting phase to determine how to test and market Insultex House Wrap" and that he disclosed confidential information to Yarbrough about Insultex's composition, chemical mix, and insulating properties. (Docket No. 66-1 at ¶¶ 9, 11-13, 21). Such conclusory assertions, without more, are insufficient for IDI to satisfy its burden of pointing to specific and unambiguous confidential disclosures that it made to Yarbrough. *Syngenta*, 2004 WL 2223252, at *3; *Greene,* 202 F.R.D. at 429. Even if IDI supported its motion with more detailed assertions here, it cannot establish that it will suffer prejudice if such communications are revealed because both Loew and IDI's CEO, Riccelli, discussed these very same issues during their depositions on July 13, 2017 and September 7, 2017, respectively. (Docket No. 75-23 at 6-8; 75-24 at 3-4, 8-9); *Eastman Kodak*, 2012 WL 4103811, at *8. Indeed, IDI does not dispute that such information is discoverable in this case, nor does it contest that the FTC's replacement expert (if the Court were to disqualify Yarbrough) would be able to rely on the information discussed by Loew and Riccelli during their depositions, as well as the other publicly available information considered in Yarbrough's report, including the patent application and the Insultex product, which is available at numerous national retailers. (Docket Nos. 75 at 10-11; 92 at 22-23, 31); *Cherry Hill*, 994 F.Supp. at 250-51; *Greene,* 202 F.R.D. at 430.

IDI's position herein also presupposes that it retained Yarbrough as a consultant in July 2012 and April 2013, without evidence of same. (Docket No. 66 at 10). Other than Loew's conclusory declaration which identifies Yarbrough as a consultant, IDI supports this premise with

the above-described e-mail from Ruis on April 23, 2013 and an excerpt from Yarbrough's deposition. (Docket No. 66 at 5). In the e-mail, Ruis sent Loew and Riccelli the second set of test results, stating "we can discuss the results and *how to improve on the R value*," which he also described as a "project." (Docket No. 66-9). Similarly, Yarbrough testified that because obtaining a value of R3 is "problematic" with a thin material like Insultex: "I had attempted to do what I do, that is how can I change this product into something that has a chance to work." (Docket No. 66-2 at 3-4). While statements like these, when viewed in isolation, may suggest that IDI retained Yarbrough as a consultant, the surrounding circumstances support the opposite conclusion.

The portions of the July 2012 and April 2013 contracts identifying the "Scope of ***Project***" and "Cost" do not reference consulting. (Docket No. 66-7) (emphasis added). Rather, they simply list the ASTM C518 tests that IDI hired R&D to perform, for which IDI paid R&D a total of $1,150. (Docket Nos. 66-7). The FTC, in contrast, has allegedly paid R&D over $20,000 for Yarbrough's expert services in this case, to date. (Docket No. 75 at 17). IDI's position that it retained Yarbrough as a consultant is also refuted by all of the other documentary evidence in the record, including the July 2012 e-mails, the April 2013 letter from Loew to Yarbrough, and the deposition excerpts of Yarbrough and IDI's CEO, Riccelli. (Docket Nos. 66-2 at 3-4; 66-3; 66-4; 66-5; 66-8; 75-24 at 7). To be sure, Riccelli specifically stated during his deposition that he retained R&D and Yarbrough to confirm BRC's test results: "I hear about R&D Services being this lab that is the lab that knows what they're doing and I'm figuring, you know what, I spent all this money, what's another $750 to have them see what they get, you know, and it was the same as everyone else using the standard C518 method." (75-24 at 7). Thus, IDI's argument that Yarbrough should be disqualified for being its prelitigation consultant is not only legally

erroneous, *Cherry Hill*, 994 F.Supp. at 250; *Weaver*, 2009 WL 1230297, at *10, but is also factually erroneous, on the record before the Court.

The Court acknowledges that, in light of Yarbrough's role within R&D as both a product tester and a testifying expert, much of this dispute could have been avoided if R&D had a system in place to vet potential conflicts of interest. *See Wang Laboratories, Inc. v. Toshiba Corp.*, 762 F.Supp. 1246, 1250 (E.D. Va. 1991). Contrary to the position taken by the FTC during the oral argument, the fact that R&D is a small company, in this Court's estimation, is no excuse for it not having a conflicts system in place. (Docket No. 92 at 9-10, 47-48). That said, the Court cannot overlook that IDI unjustifiably dragged its feet in bringing this motion, nor can it disregard that no "confidential information" was disclosed to Yarbrough.[5] *Cherry Hill*, 994 F.Supp. at 250.

The policy considerations also weigh against disqualifying Yarbrough as the FTC's expert. This inquiry necessarily overlaps with the above two-step inquiry. *Stencel v. Fairchild Corp.*, 174

_____

[5]        Where no "confidential information" is disclosed to the expert, it is unnecessary to analyze the issue of waiver. *Weaver*, 2009 WL 1230297, at *10 n. 4. In any event, the Court notes that IDI has failed to carry its burden of non-waiver. *Greene*, 202 F.R.D. at 430. Waiver is defined as the "intentional relinquishment or abandonment of a known right." *Barna v. Bd. of Sch. Dir. Of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017); *see also English Feedlot, Inc. v. Norden Lab., Inc.*, 833 F.Supp. 1498, 1504 (D. Col. 1993) (applying a similar definition of waiver in this context). The FTC provided IDI with portions of Yarbrough's draft expert report (which was on R&D letterhead) in October 2016 during prelitigation settlement discussions. (Docket No. 75-23 at 3). At the December 21, 2016 case management conference, IDI did not complain of a conflict when Yarbrough was identified as the FTC's expert, notwithstanding that Riccelli and an IDI board member were in attendance. (Docket No. 12). Although IDI objected to Yarbrough testing unidentified material, it did not otherwise object to him attending the entirety of a two-day deposition and inspection at BRC in Taunton, Massachusetts in mid-April 2017. (Docket Nos. 17-19). It waited until June 2017 to inform the FTC that it was contemplating moving to disqualify Yarbrough, and it did not inform this Court of same until a telephone status conference on November 21, 2017. (Docket Nos. 60, 66 at 13; 75 at 7, 75-22 at 2-4). All of these facts demonstrate that IDI has failed to satisfy its burden of non-waiver. *See English Feedlot*, 833 F.Supp. at 1504. But, even absent wavier, these same facts counsel against disqualification at this stage of the case because it would result in undue delay, as well as prejudice to the FTC by requiring it obtain a replacement expert after already having borne significant time and expense for Yarbrough's services. *Id.*

F.Supp.2d 1080, 1083 (C.D. Cal. 2001). But, briefly, the Court does not believe that disqualification is necessary to prevent conflicts of interest or preserve judicial integrity since IDI did not disclose any confidential information to him during this case and his report is based entirely on discoverable and publicly-available information. *See Novartis*, 2011 WL 691594, at *4. The Court is also mindful that IDI only paid R&D a total of $1,150 for Yarbrough to conduct three tests of its product before the FTC instituted its investigation and that there is no other evidence in the record to suggest that IDI retained Yarbrough as a consultant. *See Stencil*, 174 F.Supp.2d at 1083 ("If experts are too easily disqualified, unscrupulous attorneys may attempt to create relationships with numerous potential experts at a nominal fee hoping to preempt the availability of their adversaries to obtain expert assistance."). Under the circumstances, the Court finds that Yarbrough's prior testing of Insultex and his relationship with IDI is not a basis for disqualification and instead is a credibility factor that the Court will consider when assessing the veracity of his testimony during the eventual bench trial in this matter. *See Butamax,* 2012 WL 4815593, at *3 (finding that the policy considerations weighed against impeachment when the expert was "one of a limited number of individuals with expertise" in the field).

### B.    MOTION FOR PROTECTIVE ORDER

The Court next turns to the parties' dispute regarding IDI's sealed motion for protective order to designate information as confidential material. (Docket No. 86). On January 24, 2018, the Court entered an Order which provisionally permitted the FTC to file under seal its opposition and other documents related to IDI's disqualification motion. (Docket No. 73). Although the FTC disputed that the documents submitted by IDI in connection with the disqualification motion were confidential, it moved to file the opposition documents under seal to give IDI "an opportunity to seek further protection from the Court." (Docket No. 72). Thereafter, on February 12, 2018, IDI

filed the pending motion for protective order, seeking a blanket Order from the Court requiring the FTC to redact several documents that it filed in opposition to IDI's motion to disqualify Yarbrough. (Docket Nos. 85, 86).

Pursuant to the parties' stipulated protective order, "Confidential Material" includes "trade secret(s) or other confidential research, development, or commercial information." (Docket No. 16 at ¶ 1). According to IDI, the Court should order the FTC to redact (1) several portions of the FTC's brief in opposition to IDI's motion to disqualify, including any and all references to "specific test results, specific test data, prices paid for testing, specific terms of the Client Confirmations, conversations between Yarbrough and Mr. Loew, various test methods that IDI employed in research and development, Footnote 14 and the portions of the Exhibits listed herein"; (2) Yarbrough's entire expert report; (3) paragraph 6 of Yarbrough's declaration; (4) certain excerpts from Yarbrough's deposition; (5) certain excerpts from Loew's deposition; (6) certain excerpts from the Riccelli/Domian deposition; and (7) two paragraphs from Attorney Rosenberg's email to IDI's counsel. (Docket No. 86). The FTC objects that none of the described material is confidential and that IDI has failed to carry its burden in establishing same. (Docket Nos. 90 and 91 at 2).

At the outset, blanket motions to seal like IDI's motion for protective order directly conflict with this Court's Standing Order dated January 27, 2005, which prohibits the "automatic sealing of documents that are filed with the Court." *In re: Confidentiality and Protective Orders in Civil Matters,* Misc. No. 05-45, Docket No. 1 (W.D. Pa. Jan. 27, 2005); *see also* Comment to LCvR 5.2.H (explaining that LCvR 5.2.H implements said Standing Order). A party seeking to file documents under seal must demonstrate that *each* document is eligible for same. *Id.* It is axiomatic

that a party cannot satisfy this burden by filing a conclusory motion devoid of analysis, as IDI has done here. *Id.*

In this Court's opinion, IDI fails to account for the strong presumption in favor of public access with respect to all of these documents, *Littlejohn v. Bic Corp.*, 851 F.2d 673, 678 (3d Cir. 1988), since they were "filed with the court, or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings" in opposition to its motion to disqualify Yarbrough. *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001); *Pansy v. Borough of Stroudsburg*, 23 F.3d 784, 786 n. 11 (3d Cir. 1994) ("whether the relevant document is in the court file is the critical inquiry"). IDI's motion cites no case law and sets forth no reasons, let alone "compelling reasons," to justify the non-disclosure of these judicial records. *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 2013 WL 1336204, at *4 (W.D. Pa. 2013); *see also In re Cendant Corp.*, 260 F.3d at 194 (the appropriate test to apply for court proceedings and judicial records is a "compelling countervailing interests" standard).

To prevail on this motion, IDI not only "bears the burden of showing that the material is the kind of information that courts will protect," but also that "disclosure will work a clearly defined and serious injury to the party seeking disclosure." *Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994). "In delineating the injury to be prevented, specificity is essential." *In re Cendant Corp.*, 260 F.3d at 194. "Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient." *Id.* Here, IDI's motion provides no analysis to support its vague assertions that the various documents or statements therein are "confidential research, development, or commercial information" and it does not identify what potential harm it will suffer if such information is disclosed. *See LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 220 (3d Cir. 2011) (a party's vague assertions of "secretive business information" which would cause it to

suffer a "tactical disadvantage" were insufficient to establish a strong private interest in maintaining confidentiality).

IDI's motion for protective order also ignores that the Court could not issue this judicial decision on its motion to disqualify Yarbrough without considering much of the information that it seeks to have designated as confidential material. *See Weismantle v. Jali*, 2015 WL 1866190, *2 (W.D. Pa. 2015) (Hornak, J.) (recognizing the "strong presumption in favor of public access to the records upon which a federal court does its decisional duty"). For this reason, the Court ordered the FTC on January 11, 2018 to attach "all of the documents that it produced to [IDI] in its Rule 26(a)(2)(B) expert disclosures with respect to Dr. Yarbrough" to its opposition. (Docket No. 67) (emphasis in original); *see also Pansy*, 23 F.3d at 784 ("It is well-established that a district court retains the power to modify or lift confidentiality orders that it has entered."). Hence, by electing to place this disqualification issue squarely before the Court for a judicial determination, it should come as no surprise to IDI that "[t]his Court will document any evidence it feels necessary to explain its determination, regardless of the parties' positions on confidentiality." *Carnegie Mellon*, 2013 WL 1336204, at *11 n. 29; *see also Franzi v. UPMC Presbyterian Shadyside*, Civ. Action No. 12-1432-NBF, Docket Nos. 106 and 110 (W.D. Pa. 2016) (denying the plaintiff's successive motions to seal her entire case and/or the Court's summary judgment opinion after the parties reached a settlement agreement because judicial opinions are not merely the property of private litigants, the opinion was independently available on the internet and through numerous legal service providers, and the information discussed therein was of record and necessary for the Court to explain its decision) (citations omitted).

Further, "it is well established that the release of information in open court is a publication of information and, if no effort is made to limit its disclosure, operates as a waiver of any rights a

party had to restrict its future use." *Littlejohn*, 851 F.2d at 677-78. Notably, much of the same information that IDI seeks to designate as confidential material was discussed during the February 6, 2018 oral argument and no efforts were made to seal the transcript which has since been filed on the Court's docket. (Docket No. 92); *see also United States v. Martin*, 746 F.2d 964, 968 (3d Cir. 1984) (transcripts are regarded as judicial records).

In all, IDI's motion for protective order falls woefully short of satisfying its burden of demonstrating compelling reasons to overcome the presumption of access to the courts. *In re Cendant Corp.*, 260 F.3d at 194; *Carnegie Mellon Univ.*, 2013 WL 1336204, at *9. Therefore, it is denied.

## IV. CONCLUSION

For the reasons stated herein, IDI's motion to disqualify the FTC's expert (Docket No. [65]) was appropriately denied by the Court on February 21, 2018, (Docket No. [87]). IDI's sealed motion for protective order to designate information as confidential material (Docket No. [86]) is likewise denied. An appropriate Order regarding the latter motion follows, the Court having already entered an Order denying the former.

*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: March 15, 2018.

cc/ecf: All counsel of record.